# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

|  |  |
|---|---|
| SHERRY FLOR, as personal representative of the Estate of Richard Giles Flor, | CV 15-47-BLG-SPW-CSO |
| Plaintiff, | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| vs. | |
| CORRECTIONS CORPORATION OF AMERICA, SHELBY PRISON, | |
| Defendants. | |

On May 6, 2015, Plaintiff Sherry Flor ("Flor"), as personal representative of the Estate of Richard Giles Flor ("Richard Flor"), filed this action in Montana state court against Defendant Corrections Corporation of America ("CCA"). *Cmplt. (ECF No. 3).*[1] Flor claims that CCA was negligent while Richard Flor was a federal inmate at CCA's Crossroads Correctional Center in Shelby, Montana ("Shelby facility"), and that such negligence caused damages. *Id. at 2-3.* Flor's Complaint

---

[1]"ECF" refers to the document as numbered in the Court's Electronic Case Files. *See The Bluebook, A Uniform System of Citation, § 10.8.3.*

seeks "survival action and wrongful death" damages because of CCA's alleged negligence, and also seeks punitive damages. *Id. at 3.*

On June 5, 2015, CCA removed the case invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332(a). *Notice of Removal (ECF No. 1) at ¶¶ 4-8.* On June 26, 2015, Judge Watters referred the case to the undersigned under 28 U.S.C. § 636(b)(1)(B). *Order (ECF No. 7).* Pending is CCA's motion for summary judgment. *CCA's Summary Judgment Mtn. (ECF No. 16).* For the reasons discussed below, the Court recommends that CCA's motion be granted.

## I.   <u>Background Facts</u>[2]

On April 19, 2012, Richard Flor was sentenced in federal court, Cause No. CR 11-7-H-CCL, to sixty months incarceration with the U.S. Bureau of Prisons. Richard Flor was incarcerated at the Shelby facility from April 26, 2012, until August 24, 2012, as a federal inmate. CCA had no involvement with Richard Flor before his assignment by the

---

[2]The background facts are from the parties' Joint Stipulated Statement of Facts *(ECF No. 9)*, CCA's Statement of Undisputed Facts *(ECF No. 19)*, and Flor's Statement of Disputed Facts *(ECF No. 23)*. The Court has included only those facts that it deems relevant to the motion at hand. The facts are undisputed unless otherwise noted.

U.S. Marshals Service to the Shelby facility.

On August 24, 2012, Richard Flor was transported by airplane from the Shelby facility to the Nevada Southern Detention Center near Las Vegas, Nevada. CCA operates Nevada Southern Detention Center.

On August 27, 2012, Richard Flor was moved from the Nevada Southern Detention Center to the University Medical Center in Las Vegas, Nevada. He died there on August 30, 2012, after being removed from life support.

Also on August 30, 2012, Lisa Gavin, M.D., a Medical Examiner with the Clark County Nevada Coroner's office, conducted a post-mortem examination and autopsy. Dr. Gavin's report concluded:

> CAUSE OF DEATH: This 68-year-old man, Richard Giles
> Flor, died of metastatic colonic adenocarcinoma. Other
> significant contributing conditions include chronic
> obstructive pulmonary disease, renal insufficiency and
> hypertension.
> MANNER OF DEATH: NATURAL.

Before Richard Flor died, his colon cancer had never been diagnosed. Dr. Gavin testified in her deposition that: (1) Richard Flor's colon cancer was extensively metastasized throughout his body, including in his liver, diaphragm, spleen, omentum, lymph nodes, and

bones; and (2) the metastases, to the extent Richard Flor had them, would have taken a long time to form and would have been very difficult to treat.

Dr. Michael Van Scoy-Mosher, who is board-certified in internal medicine and medical oncology, provided an export report indicating his opinion that there was no breach of the standard of care in CCA's provision of medical care to Richard Flor. Richard Flor's cancer, which caused his death, was untreatable by the time he was initially housed at the Shelby facility. Dr. Van Scoy-Mosher was deposed. In response to questions regarding his opinion that CCA did not breach the standard of care, he testified that: (1) "[a]nything that might have been done in relation to his cancer would have been of no importance or benefit[ ]"; (2) "[j]udging from the extent of his cancer in August of 2012, there was no question in my mind that even in let's say January of 2012, it would have been incurable and metastatic[ ]"; and (3) he saw nothing in the medical records that would have made him think of metastatic cancer prior to Richard Flor's rapid deterioration in his condition in late August, 2012.

On May 6, 2015, Flor, as the personal representative of the estate of Richard Flor, filed a complaint in Montana state court against CCA alleging negligence against CCA and seeking damages for wrongful death, survival, and punitive damages. After the action's removal, this Court set deadlines, in a Scheduling Order filed on July 9, 2015, by which the parties were to disclose their expert witnesses. The parties agreed to extend the deadlines, and Flor timely provided an expert witness disclosure on January 13, 2016. She identified a corrections expert, but did not disclose, and has not identified, any medical expert witness to address medical treatment provided at the Shelby facility. Thus, Dr. Van Scoy-Mosher's opinion and testimony are undisputed.

Also, Flor deposed other medical staff who provided care to Richard Flor while he was at the Shelby facility. Nurse Jennie Didier testified that: (1) she provided an initial intake assessment of Richard Flor and treated him at various times thereafter; and (2) when asked whether she had made any determination that Richard Flor was too sick to be taken care of at the Shelby facility, i.e., whether he required full-time nursing home care, she testified that it would not be CCA's

determination to make but rather that the U.S. Marshals Service determines where its inmates are housed, not CCA.

Dr. Todd Gianarelli, pursuant to contract with the Marias Medical Center, provided medical care to inmates at the Shelby facility at the time Richard Flor was housed there. Dr. Gianarelli testified that: (1) he did not make decisions regarding where inmates were housed with the exception that he could determine whether an inmate could or should be sent to the Shelby facility's medical department; (2) as a doctor providing care at the Shelby facility, he exercised his own independent medical judgment and had occasions where he recognized an inmate could not be taken care of at the Shelby facility so he recommended that the inmate be moved to another facility or hospital; and (3) he would have noted in his chart if he believed Richard Flor had significant health concerns that could not be addressed at the Shelby facility, but he did not make any such assessment.

Physician's assistant ("PA") Chris Rost also provided medical care to Richard Flor pursuant to the Shelby facility's contract with the Marias Medical Center. PA Rost was deposed regarding medical

treatment he provided to Richard Flor, discussing some of the more than 270 pages of medical records created by CCA regarding its care of Richard Flor and another 241 pages of medical lab reports. PA Rost testified that: (1) during the time he provided medical care for inmates at the Shelby facility, he exercised his own professional medical judgment in treating the inmates; and (2) when he treated Richard Flor, although he could recommend that an inmate be transferred for care at another medical facility such as a hospital, his opinion was that Richard Flor could receive adequate medical care at the Shelby facility.

Flor has no medical expert to dispute the testimony of these medical providers. Flor has disclosed one retained expert – Dennis R. McCave ("Mr. McCave") – upon whose opinions Flor intends to rely. In his report, Mr. McCave indicates that he intends to provide opinions that:

(a) "Richard Flor suffered from obvious and long term physical conditions, along with a suggested mental impairment, that would require constant monitoring and assistance such as a medical or assisted care type facility…;"

(b)  It appears Richard Flor, while housed at the Shelby facility, "deteriorated physically and mentally, incurred injuries and suffered often with pain;"

©)  Though "there appear to be times where Mr. Flor was treated, at times, for injuries or chronic mental episodes, there did not appear to be any appreciation for Mr. Flor's deteriorating condition and health;"

(d)  It "would appear that the staff and administration of the Crossroads Facility in Shelby, ignored or failed to respond appropriately to the 'care and custody' of Mr. Flor's condition/situation;"

(e)  "It is my opinion that Mr. Flor was incarcerated at the [Shelby facility] with multiple, serious medical issues;"

(f)  ". . . it does not appear that there was a competent, consistent care plan, addressing his serious medical needs;"

(g)  "no indication that Corrections Corporation of America maintained a standard of 'care and custody' appropriate for someone in his physical and mental state;"

(h)  "no indication that CCA provided, as requested by Judge Lovell, "... *that Mr. Flor be forthwith transported to a United States*

*prison hospital for an examination and treatment if necessary and classification and determination of appropriate place of incarceration;*"

I) "I believe that if Mr. Flor had received appropriate identification, treatment and intervention of his serious medical issues during the four (4) months at [the Shelby facility], he would not have passed away within a week of being transported out."

Mr. McCave worked from 1978 through 2012 for the Yellowstone County Sheriff's Department, with most of that experience as an officer and administrator in the Yellowstone County Jail. He testified that, in his experience as an administrator at Yellowstone County Jail, he would discuss medical issues with qualified medical staff, doctors and nurses, and the medical professionals would make decisions regarding inmate medical care because Mr. McCave, as a jail captain, was "not qualified" to provide a medical opinion.

Mr. McCave was asked to explain the basis for his opinion that "Mr. Flor suffered from obvious long-term physical conditions." He responded that his opinion was based on his review of Richard Flor's medical records. When asked what qualifications he had to review and

interpret medical records as an expert witness, Mr. McCave responded that he was not interpreting the records as a medical expert. Rather, he claims to be interpreting them as "an administrative kind of function area thing where I would review records and such."

In discussing his review of Richard Flor's medical records, Mr. McCave testified "I wouldn't question the medical professional who wrote those, I guess." Mr. McCave also was asked to explain the basis for his opinion that Richard Flor "would require constant monitoring and assistance such as medical assisted care type facility." Mr. McCave testified that he was relying upon Judge Lovell's "sentencing statement" and the fact that Judge Lovell had "reviewed more documents than I had about his medical condition." Mr. McCave testified that because there were so many medical records "there was obviously something there."

When asked who at the Yellowstone County Jail would have determined whether that facility could provide adequate medical care, Mr. McCave admitted that decision would be collaborative between the jail administrators and medical staff, stating, "I mean, I would never –

I would never contradict a medical decision, especially if I don't have that medical expertise."

Mr. McCave was asked "who makes the determination whether or what medical care is appropriate, it would be the medical professionals, right?" His response was "That's correct."

Mr. McCave was asked if a doctor or PA meets with an inmate, for example an inmate with a lot of medical records, and determines that they can be taken care of at that facility, would he have any reason to dispute the medical professional's decision. He responded, "No." When informed that Dr. Gianarelli and PA Chris Rost had testified that they believed that Richard Flor would be provided with adequate medical care at the Shelby facility, Mr. McCave admitted that he had no qualifications or expertise that would allow him to disagree with their professional medical judgment.

Mr. McCave was asked to further explain the basis for his opinion that Richard Flor needed to be in a facility that provided constant monitoring and assistance. He responded that his opinion was based on the medical records and talking with Plaintiff's counsel and stated

that "it seemed like he had a lot of chronic, possible concerning issues that maybe exceeded the average inmate." Mr. McCave admitted, however, that he did not know what medical facilities were available to care for Richard Flor at the Shelby facility.

Mr. McCave then testified that based on his review of Richard Flor's medical records "it seemed like he was deteriorating." He further responded, "Typically, when you have multiple physical issues, you have – there should be some sort of therapy, you know, to try to treat those and try to keep you from deteriorating any more. I didn't – I didn't notice any therapeutic, other than just medicating and, you know, addressing the immediate issues." When asked to explain his opinion that there should have been some sort of medical therapy and what type of therapy, Mr. McCave responded, "It's care and custody. I guess the standard I work from is what I believe is that you don't let anyone deteriorate in your custody…"

Mr. McCave was asked to explain the opinion in his report that Richard Flor "deteriorated physically and mentally, incurred injuries, and suffered often with pain." Mr. McCave responded that opinion was

based on his review of Richard Flor's medical records and "that's just what I interpreted."[3]

Mr. McCave admitted that he was provided approximately 500 pages of medical records from Richard Flor's treatment at CCA facilities that he used to reach his opinions, but stated with regard to those records: "Yeah, I just, I mean, I don't understand medical lingo a hundred percent. So, I mean, I look through them and try to interpret what I can from them."

Mr. McCave was asked to explain the basis for his opinion that "there did not appear to be any appreciation for Mr. Flor's deteriorating condition and health." He responded that it was "obvious" because "he died within a week after leaving."

Mr. McCave was asked why, in his written report, he included the term "care and custody" in quotation marks. He responded that he believed "care and custody is placed with the administration, not with the medical. That's the administration's responsibility. When I accept

---

[3]Flor does not dispute this statement, in part, but refers the Court, without reference to any specific pages or parts, to the transcript of Richard Flor's sentencing, the depositions of Kristin Flor and Michael Lufborough, and the affidavit of Rodney Pitts.

a prisoner into my facility, I am assuming responsibility to care for them and to keep them in custody so they don't run around the streets and commit more crimes or hurt people. So those are the primary – that's kind of like, I guess, the arterial function of detention facilities and prisons is to – you're responsible to care for them and to maintain their custody and to keep them confined."

Mr. McCave was asked to explain whether he understood what caused Richard Flor's death. He said, "medically speaking, not a hundred percent. I mean, obviously his heart." He continued and explained: "I believe I was reading that the coroner's report stated something he died from some cancer [that] caused some organ to stop functioning, basically and that's what he died from."

Mr. McCave was asked whether he knew of anything that CCC could have done to prevent Richard Flor's death when it occurred. He responded, "I don't know. We're all going to die. It's just a matter of when and how. And my suggestion, my opinion is, is that – I know the one doctor said something about, There was nothing CCA could have done that would have changed the outcome or that he wouldn't have

died." Mr. McCave provided further explanation, suggesting his "experience" showed that if a "person has got some sort of therapeutic treatment going on and everything, typically, they're going to live longer and a more comfortable life." However, Mr. McCave admitted that he had no medical expertise and could not provide an "absolute medical opinion."

Mr. McCave was asked to explain the basis for his opinion that CCA failed to have a "competent consistent care plan addressing [Richard Flor's] serious medical needs," and he was asked who would have put together such a plan. He responded that a prison administrator would not put together such a plan, but the medical department would. He further suggested it is his opinion that the doctor, the PA, and nurses at the Shelby facility did not put together a competent consistent care plan for Richard Flor.

Mr. McCave admitted that he did not know whether anything could have possibly been done during the time Richard Flor was at the Shelby facility that would have prolonged Mr. Flor's life or otherwise affected his cancer. He further admitted that such a determination

would need to be made by an oncologist or other medical professional who understands cancer.

## II.   Summary of the Parties' Arguments

### A.   CCA's Arguments

In moving for summary judgment, CCA argues that Flor's negligence claim is based on an alleged failure by CCA to provide Richard Flor with adequate medical care.  Under Montana law, CCA argues, such a claim requires an expert medical opinion establishing the applicable standard of care and a subsequent departure from that standard.  *CCA's Opening Br. (ECF No. 17) at 9-12.*  But, CCA argues, Flor has failed to identify an expert qualified to render an opinion on those issues.  Thus, CCA argues, Flor cannot: (1) show the applicable standard of care; (2) demonstrate that CCA breached the standard; and (3) prove causation necessary for a negligence claim.  *Id. at 17-23.*

CCA also argues that Flor's identified expert witness, Mr. McCave, is not qualified to opine on the subject matter addressed in his report or deposition testimony.  Thus, Flor argues, the Court should exclude his testimony.  *Id. at 13-16.*

## B.     Flor's Response

Flor argues that summary judgment for CCA is precluded principally because CCA bases its motion on a mistaken view of the claim Flor asserts in this action.  Flor argues that the Complaint alleges ordinary negligence only, and not a medical malpractice claim as CCA argues. *Flor's Resp. Br. (ECF No. 22) at 8-11.*  Because only an ordinary negligence claim is asserted and she does "not fault the medical care [that Richard Flor received]," Flor argues, no claim is asserted for which medical expert testimony is needed.  *Id. at 11.*

And because Flor's claim is that CCA breached its duty respecting the care and custody of inmates in its treatment of Richard Flor, Mr. McCave, because of his experience and training in the care and custody of inmates at detention facilities, is an appropriate expert in this case. *Id.*  Flor maintains that CCA knows that Mr. McCave's opinion is not about medical care but rather about CCA's breach of its duty of care and custody of an inmate because CCA retained its own expert in this exact field.  *Id. at 13.*

Respecting causation, Flor argues that "[t]he lack of proper care

and custody of Richard Flor caused him to suffer needlessly." *Id. at 15*.

She argues that "[w]e have not sought an opinion on failure to diagnose the cancer, nor on treatment of that cancer" because "[o]ur sole measure of damages as put forth in our discovery responses has been narrowed down to the pain and suffering Richard Flor endured because he was not placed in some type of nursing home type of setting with people besides inmates [who] could help him shower, control his pain, and treat him like a human instead of an abandoned dog." *Id*.

## C.   CCA's Reply

CCA argues that the Court should reject Flor's attempt to reframe the Complaint's allegations as a failure to provide "care" rather than a failure to provide "medical care" to obviate the need for expert witness testimony to establish the standard of care and breach thereof. *CCA's Reply Br. (ECF No. 27) at 2-7*. CCA argues that both the Complaint's allegations and Flor's arguments responding to the instant motion make clear that the "care" Flor claims was not provided to Richard Flor is actually "medical care" as follows: (1) the Complaint alleges CCA breached its duty to provide reasonable care when Richard Flor and his

family continuously requested and demanded "proper medical care" but he was denied treatment," a concession that Flor's negligence claim alleges a lack of proper medical care, *id. at 3-4*; (2) Flor's response brief shows that the type of "care" she claims was inadequate was the type requiring a medical professional's judgment because she claims Richard Flor "was not placed in some type of nursing home type setting" that could provide for his medical needs, *id. at 5*; and (3) although CCA does not decide which federal inmates are placed in its facilities because that determination is left to the U.S. Marshals Service, the Shelby facility's medical professionals exercise their professional medical judgment in determining whether inmates can be adequately treated at the facility or whether the Marshals Service needs to transfer them because their medical needs cannot be met at the Shelby facility, and in this case they determined that Richard Flor could be adequately cared for at the Shelby facility, *id. at 5-6*.

CCA also argues that lay testimony is insufficient evidence to prove the claims that Flor asserts. *Id. at 7-9.* CCA argues that Flor's reliance on deposition testimony from federal inmate Michael

Lufburough, the affidavit of federal inmate Rodney Pitts, and the sentencing hearing testimony of Kristin Flor, Richard Flor's daughter, is misplaced because none are medical experts qualified to opine respecting Richard Flor's medical conditions or the care he received for them. *Id*.

Finally, CCA argues that Mr. McCave is not qualified to render opinions respecting the type of care Richard Flor received and that is at issue in this case. *Id. at 9-13*. Thus, CCA argues, Flor cannot establish the elements of her claim and CCA is entitled to summary judgment. *Id*.

## III. <u>Applicable Law</u>

### A. <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if

any, which it believes demonstrate the absence of a genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Material facts are those which may affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as

to a material fact is genuine if there is sufficient evidence for a

reasonable fact-finder to return a verdict for the nonmoving party. *Id.*

If the moving party meets its initial responsibility, the burden then

shifts to the opposing party to establish that a genuine issue of fact

exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986).

## B. Application of Montana Law

As noted, the Court's jurisdiction is based on diversity of

citizenship. Thus, the Court must apply the substantive law of

Montana, the forum state. *In re County of Orange*, 784 F.3d 520, 523-

24 (9th Cir. 2015) ("Under the *Erie* doctrine, federal courts sitting in

diversity apply state substantive law and federal procedural law.")

(citation omitted); *see also Medical Laboratory Mgmt. Consultants v.*

*American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir.
2002).

In actions based on diversity jurisdiction, the federal court "is to
approximate state law as closely as possible in order to make sure that
the vindication of the state right is without discrimination because of
the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir.
1980). Federal courts "are bound by the pronouncements of the state's
highest court on applicable state law." *Appling v. State Farm Mutual
Auto. Ins. Co.*, 340 F.3d 769, 778 (9th Cir. 2003) (citation omitted).

## IV.   Discussion

As discussed above, the parties' principal disagreement centers on
whether Flor's claim against CCA is one of ordinary negligence or
whether, as CCA maintains, the claim requires determination of issues
for which expert testimony is necessary.

It is, by now, well-settled under Montana law that a plaintiff
asserting a negligence claim who seeks to survive summary judgment
"must raise genuine issues of material fact with regard to a legal duty
on the part of the defendant, breach of that duty, causation, and

damages." *Beehler v. Eastern Radiological Associates, P.C.*, 289 P.3d 131, 136 (Mont. 2012) (quoting *B.J. v. Shultz,*, 214 P.3d 772, ¶ 13 (Mont. 2009) (citing *Butler v. Domin,* 15 P.3d 1189, ¶ 21 (Mont. 2000)). And, it is equally well-settled that a plaintiff asserting negligence in the provision of medical care "must generally produce expert medical testimony establishing the applicable standard of care and a subsequent departure from that standard." *Id.* (citing *Butler*, 15 P.3d at ¶ 21); *see also Estate of Nielsen v. Pardis*, 878 P.2d 234, 235 (Mont. 1994); *Hunter v. Missoula Community Hosp.*, 750 P.2d 106, 106 (Mont. 1988); *Montana Deaconess Hosp. v. Gratton*, 545 P.2d 670, 672 (Mont. 1976). The Montana Supreme Court, in developing this latter rule, "reasoned that because 'juries composed of laymen are normally incompetent to pass judgment' on questions of whether 'reasonable care' was exercised in undertaking 'work calling for a special skill[,]' there can be 'no finding of negligence in the absence of expert testimony to support it.'" *Brookins v. Mote*, 292 P.3d 347, 362 (Mont. 2012) (quoting *Carlson v. Morton*, 745 P.2d 1133, 1137 (Mont. 1987) (quoting *Prosser and Keeton*, THE LAW OF TORTS, § 32 (West 5th ed., 1984))).

There is an exception to this rule. Expert testimony is not necessary to establish the medical standard of care "when the conduct complained of is readily ascertainable by a layperson." *Dalton v. Kalispell Regional Hosp.*, 846 P.2d 960, 963 (Mont. 1993). But "[a] bad result alone does not constitute evidence or raise a presumption or inference of negligence." *Montana Deaconess*, 545 P.2d at 673. Montana law, moreover, does not permit a plaintiff to rely on the *res ipsa loquitur* doctrine "to supplant the expert testimony regarding standard of care and breach thereof required in a malpractice case." *Estate of Nielsen*, 878 P.2d at 236 (citing *Dalton*, 846 P.2d at 963).

The Court here concludes that Flor's negligence claim is not one of ordinary negligence. Rather, because his allegations raise issues concerning the appropriate standard of care for provision of medical care and treatment and whether CCA deviated from that standard, Flor's negligence claim is a claim for which expert medical testimony is necessary.

The Complaint directly alleges that CCA failed to provide Richard Flor with appropriate medical care while he was a federal inmate at the

Shelby facility.  For example, the Complaint expressly alleges that:  (1) "[w]hile incarcerated at CCA, Richard Flor made numerous <u>medical</u> requests for <u>medical treatment</u>, by writing <u>medical request "kites"</u> to employees of CCA[,]" *ECF No. 3 at ¶ 8* (emphasis added); (2) Richard Flor's family members called and notified Shelby facility staff and administrators "numerous times [that] he was <u>suffering from extreme</u> <u>pain</u> and was <u>disabled</u>[,]" *id. at ¶ 9* (emphasis added); (3) while incarcerated at the Shelby facility, Richard Flor "<u>suffered from cancer,</u> undiagnosed, and was unable to <u>properly care for himself or feed</u> <u>himself</u>[,]" *id. at ¶ 10* (emphasis added); (4) even though he was in distress, the Shelby facility staff "refused and failed to get any <u>proper</u> <u>medical care or take care</u>" of him, *id. at ¶ 11* (emphasis added); and (5) the Shelby facility "refused to treat [Richard Flor's] necessary <u>medical</u> <u>issues</u> and instead left him to <u>suffer without care</u>[,]" *id. at ¶ 12* (emphasis added).

All of these allegations, which form the basis of Flor's negligence claim, clearly and directly implicate medical conditions, care, and treatment, each of which requires expert medical testimony.  *Beehler*,

289 P.3d 136 (citing *Butler*, 15 P.3d at ¶ 21); *see also Estate of Nielsen,*

878 P.2d at 235; *Hunter*, 750 P.2d at 106; *Montana Deaconess*, 545 P.2d

at 672.  The applicable standard of care for medical conditions, care,

and treatment – or the failure to adhere to the applicable standard of

care for each – are not issues ascertainable by laypersons under

Montana law.  *Dalton*, 846 P.2d at 963.  As this Court observed in *Ely*

*v. United States*:

> Under Montana law, what treatment may be appropriate for
> a particular medical condition – *i.e.*, whether surgery, pain
> relief, or some other treatment is indicated – is the
> quintessential question for which expert witness testimony
> is required in a medical malpractice action.  In *Dalton*, for
> example, the plaintiff argued that a hospital's failure to act
> to determine the suitability of a prosthetic device for hip
> replacement surgery before the operation began was ample
> evidence for a jury to infer negligence.  The Montana
> Supreme Court flatly rejected the argument noting that the
> hospital's "lack of action is evidence of the [h]ospital's lack of
> action and nothing more. ... [W]hat is missing here is
> evidence of any standard of care against which the acts or
> omissions of the ... hospital staff can be measured to
> establish negligence...." *Dalton,* 846 P.2d at 962 (quoting
> *Gratton*, 545 P.2d at 670).

2013 WL 5571209, *4 (D. Mont., Oct. 9, 2013).

Here, the same is true.  Flor has not presented evidence

establishing a genuine issue of material fact concerning the appropriate

standard of care for the care and treatment of an inmate with Richard Flor's myriad health conditions nor has she presented evidence demonstrating that CCA's actions or inactions deviated from that standard.  A failure to produce such evidence is fatal to her negligence claim under the circumstances of this case.  *See Beehler*, 289 P.3d at 136 (citations omitted).

And, Flor is not permitted to rely solely on Richard Flor's death shortly after being removed from the Shelby facility to prove negligence nor may she rely solely on his death to raise a presumption or inference that CCA was negligent in caring for him.  As noted, "[a] bad result alone does not constitute evidence or raise a presumption or inference of negligence."  *Montana Deaconess*, 545 P.2d at 673.

Finally, in addition to the foregoing reasons, the Court is compelled to conclude that summary judgment for CCA is necessary because Flor cannot prove, without expert medical testimony, that the claimed damages were caused by CCA.  Again, causation of damages in the context of Richard Flor's medical conditions can be established only through expert witness testimony because such a question goes beyond

the knowledge of the average layperson. *Brookins*, 292 P.3d at 362
(citations omitted). Flor has not identified an expert witness qualified
to render an opinion on such issues.

Because of the foregoing conclusions, the Court finds it
unnecessary at this juncture to further address CCA's challenge of Mr.
McCave as an expert witness in this case. Flor and Mr. McCave
concede that he is not a medical expert qualified to render opinions
respecting Richard Flor's medical conditions or the medical care or
treatment appropriate for them. For the reasons already discussed,
without an expert qualified to opine respecting the applicable standard
of care and departure from that standard, or to render an opinion
respecting causation, Flor's claim fails and CCA is entitled to summary
judgment as a matter of law.

## V.  Conclusion

Based on the foregoing, **IT IS RECOMMENDED** that CCA's
summary judgment motion (*ECF No. 16*) be GRANTED.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall
serve a copy of the Findings and Recommendation of United States

Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

DATED this 28th day of September, 2016.

**/s/ Carolyn S. Ostby**
United States Magistrate Judge